EMILY R. BURLINGHAM, petitioner-appellant,

*v.*

EDWARD J. BURLINGHAM, defendant-respondent.

[Submitted December, 1921. Decided March 6th, 1922.]

On a petition for divorce brought by a wife on the ground of constructive desertion, the evidence considered and the facts found, *held* to show no constructive desertion by the husband, but that the separation was voluntary on the part of the wife.

On appeal from a decree dismissing petition for divorce advised by Vice-Chancellor Stevenson.

*Mr. Charles E. Hendrickson,* for the appellant.

*Mr. Robert Carey,* for the respondent.

The opinion of the court was delivered by

PARKER, J.

This is a wife's suit for divorce on the ground of constructive desertion. The husband is a priest of the Protestant Episcopal Church, having a parish in another state, not far from New York City, and is about sixteen years older than his wife. The pair were married in October of 1906 and have one child, a daughter, born two years later, and who, at the time of the litigation, was living exclusively with her father.

There was a separation in 1912 when the petitioner went to Europe. She returned later, but in 1914 cohabitation ceased at her instance, and she took an apartment in New York City. In 1915 she went to live in Hunterdon county, in this state, and in March, 1918, a little more than two years later, filed the petition in this cause. Practically all the evidence in a large book consists of testimony and documentary evidence presented by her; she even called her husband as a witness. The testimony on behalf of defendant is confined to a very few pages, and relates merely to his continued residence at the rectory in his parish, and to certain attention that his wife had received there from a married man, who may be called "P." At the close of the case the learned vice-chancellor heard a summing up by the complainant's counsel, but declined to hear counsel for the defendant, saying that no case had been made out. The husband had filed a cross-petition for actual desertion, but withdrew it early in the hearing, so that the decree, while reciting this fact, merely dismisses the main petition.

We have no difficulty whatever in reaching the conclusion that the disposition made of the case by the court below was entirely

proper. That the petitioner physically left her husband and that
he did not leave her is clear and is conceded. Hence, she must
show that she left because he forced her away by a course of
conduct which consisted either of cruel and inhuman treatment
in a physical sense, or something that was tantamount to it
under the theory of our decisions, and on account of which she
could successfully have sustained a suit for limited divorce for
cruelty. *Hall* v. *Hall, 60 N. J. Eq. 469; Lister* v. *Lister, 65 N.
J. Eq. 109; affirmed, 66 N. J. Eq. 434.* But a careful examina-
tion of the evidence in this case fails to show such ill-treatment
of either class. She says he is a cad, a liar and a hypocrite, and
she hates him; all of which, as the vice-chancellor remarked,
may be entirely true, and yet would not be cause for her leaving
him so as to raise a case of constructive desertion. He was a
parson on a salary of $1,500, with the use of a rectory, and she
had an independent income of $5,000 a year or more, which
would naturally render her somewhat independent and may, in
some measure, account for her mental attitude. She was plainly
fond of attention from men, impatient of the restraint in such
matters that a clergyman's wife should exercise, and openly
resented reproof for indiscretion in that regard. Very likely it
is true, as she claims, that the reproof was lacking in tact and
unnecessarily repeated and dwelt upon; but if marriages are to
be dissolved for want of tact, and even for nagging, the institu-
tion of marriage would not last very long. He may even have
been, as she says, too fond of her money, and may have liked that
better than herself, and may have given her cause to realize it.
It is not necessary to make any finding in this respect, for, as-
suming that this was so, it does not amount to cruelty, or even
an element of cruelty, nor does it justify, or tend to justify, her
leaving him. There is an utter absence of any testimony of phy-
sical violence. He never struck her, and it is not claimed that
he ever did; and in all the letters between the parties that were
put in evidence there is not one unkind word except in a letter
written by her where, after he had sent her some flowers to her
abode in New Jersey, she wrote back that she had burned the
flowers and box in the furnace. And even this did not evoke an
intemperate reply.

*93 N. J. Eq.*                    Burlingham, *v.* Burlingham.

That she was indiscreet with at least two men is plain. One of them was "P," already mentioned. There was another man who may be called "S," and, as respects this man, her indiscretion is conspicuous, as she admits it in her own testimony. He was not a parishioner, but was a young man brought into an entertainment at the parish house to do sleight-of-hand tricks and similar things to amuse the audience. The petitioner was evidently interested in him and asked her husband about him, and he said she had better avoid him, "as he drank and was fast with women." Thereupon, she seems to have undertaken to reform him and help him, as she phrased it, by meeting him clandestinely at a restaurant in New York, generally reputed to be frequented by all sorts of people, and drinking cocktails there with him. Information of this reached the parishioners, or some of them, as did information of the attentions of "P," and she even became a subject of gossip among the servants in her own house, through whom the report reached her husband that petitioner's underwear showed signs of improper conduct with a man, presumably, "S." She undertook to discharge the servants and they refused to go, and this led to a scene in which they accused her to her husband's face, and this and the husband's course of conduct thereafter are the points most strenuously insisted on as constituting cruelty on his part. He was evidently suspicious after this, and, undoubtedly, continued to hint his suspicions to her. It may have been, and probably was, a mistake to do so; but no rule can very well be laid down for the guidance of a husband whose wife has confessedly been guilty of indiscretions more or less grave, who has disobeyed him by associating with a man she was told to be careful to avoid, and who has confessedly deceived her husband by taking meals and drinking cocktails surreptitiously with such a man at a place of somewhat questionable repute in a great city. All this, combined with a circumstantial accusation by the servants in his own household, may well lead a man to entertain persistent suspicion and to continue to voice that suspicion. Very possibly it would have been more tactful, and might have saved the situation, if he had pursued a somewhat different course of conduct; but to

say that by doing what he did he was guilty of cruelty which justified her in leaving him and charging him with constructive desertion is preposterous.

But even if it be conceded that he treated her with such injustice as to justify her in leaving him, there still remains the undeniable fact that he made repeated and apparently sincere efforts to induce her to return. She did not return; and the manifest reason why she did not do so, as it seems to us, is that she hated him and hated the place where he was living and was determined not to go back to him. Under such circumstances, she cannot for a moment justly charge him with having deserted her. The separation was of her own making, and, consequently, gives no legal support to her petition.

The decree of the court of chancery is affirmed.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER, ACKERSON—14.

*For reversal*—None.